Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
03/30/2018 08:12 AM CDT

In re Application of City of Neligh, Nebraska.
City of Neligh, Nebraska, appellee, v.
Elkhorn Rural Public Power
District, appellant.
___ N.W.2d ___

Filed March 30, 2018.    No. S-17-433.

1. **Nebraska Power Review Board: Appeal and Error.** A decision of
the Nebraska Power Review Board will be affirmed if it is supported
by the evidence and is not arbitrary, capricious, unreasonable, or other-
wise illegal.
2. **Statutes: Appeal and Error.** The meaning of a statute is a question of
law, and a reviewing court is obligated to reach conclusions independent
of the determination made below.

Appeal from the Power Review Board. Reversed and
remanded for further proceedings.

David A. Jarecke and Ellen C. Kreifels, of Blankenau,
Wilmoth & Jarecke, L.L.P., for appellant.

David C. Levy and Krista M. Eckhoff, of Baird Holm,
L.L.P., and Joseph McNally, of McNally Law Office, for
appellee.

Heavican, C.J., Cassel, Stacy, and Funke, JJ., and Riedmann
and Arterburn, Judges.

Heavican, C.J.
### INTRODUCTION
The City of Neligh, Nebraska (Neligh), filed an application
with the Nebraska Power Review Board (Board) seeking to

transfer two newly annexed territories from the Elkhorn Rural Public Power District (ERPPD) to Neligh's electrical service area and to have the Board determine the total economic impact of the transfer to the ERPPD. The Board transferred the service and assessed the economic impact at $490,445.90. ERPPD appeals. We reverse the decision and remand the cause for further proceedings.

## BACKGROUND

*Relevant Statutes.*

Neb. Rev. Stat. § 70-1008(2) (Reissue 2009) provides:

A municipally owned electric system, serving such municipality at retail, shall have the right, upon application to and approval by the board, to serve newly annexed areas of such municipality. Electric distribution facilities and customers of another supplier in such newly acquired certified service area may be acquired, in accordance with the procedure and criteria set forth in section 70-1010, within a period of one year and payment shall be made in respect to the value of any such facilities' customers or certified service area being transferred. The rights of a municipality to acquire such distribution facilities and customers within such newly annexed area shall be waived unless such acquisition and payment are made within one year of the date of annexation. If an application is made to the board within one year of the date of annexation for a determination of total economic impact as provided in section 70-1010, such right shall not be waived unless the municipality fails to make payment of the price determined by the board within one year of a final decision establishing such price. Notwithstanding other provisions of this section, the parties may extend the time for acquisition and payment by mutual written agreement.

Neb. Rev. Stat. § 70-1010 (Reissue 2009) further provides:

(1) The board shall have authority upon application by a supplier at any time to modify service areas or

customers to be served as previously established. The same procedures as to notice, hearing, and decision shall be followed as in the case of an original application. Suppliers shall have authority by agreement to change service areas or customers to be served with the approval of the board. This section shall not apply to agreements referred to in subsection (2) of section 70-1002.

(2) In the event of a proposed transfer of customers and facilities from one supplier to another in accordance with this section or section 70-1008 or 70-1009, the parties shall attempt to agree upon the value of the certified service area and distribution facilities and customers being transferred. If the parties cannot agree upon the value, then the board shall determine the total economic impact on the selling supplier and establish the price accordingly based on, but not limited to, the following guidelines: The supplier acquiring the certified service area, distribution facilities, and customers shall purchase the electric distribution facilities of the supplier located within the affected area, together with the supplier's rights to serve within such area, for cash consideration which shall consist of (a) the current reproduction cost if the facilities being acquired were new, less depreciation computed on a straight-line basis at three percent per year not to exceed seventy percent, plus (b) an amount equal to the nonbetterment cost of constructing any facilities necessary to reintegrate the system of the supplier outside the area being transferred after detaching the portion to be sold, plus (c) an amount equal to two and one-half times the annual revenue received from power sales to existing customers of electric power within the area being transferred, except that for large commercial or industrial customers with peak demands of three hundred kilowatts or greater during the twelve months immediately preceding the date of filing with the board, the multiple shall be five times the net revenue, defined as gross power sales,

less costs of wholesale power including facilities rental charges, received from power sales to large commercial or industrial customers with measured demand of three hundred kilowatts or greater during the twelve months immediately preceding the filing with the board for service area modification. After the board has determined the price in accordance with such guidelines, the acquiring supplier may acquire such distribution facilities and customers by payment of the established price within one year of the final order.

*Factual and Procedural Background.*

On July 14, 2015, Neligh passed ordinances Nos. 578 and 579, annexing areas to the north and the south of Neligh. On July 13, 2016, Neligh filed an application under § 70-1008 to transfer these territories from the ERPPD, which had provided electrical service to those areas, to an electrical service area operated by Neligh. As part of that application, Neligh sought to have the Board assess the economic impact of the transfer to ERPPD.

A hearing was held on January 27, 2017, to determine the total economic impact of the proposed transfer and the compensation owed to ERPPD by Neligh under § 70-1010. The parties stipulated that Neligh owed $490,445.90 for the loss of the service area, customers, and facilities inside the south annexation, as well as a partial amount owed for reintegration costs. As relevant to this appeal, the issue presented at this hearing was what compensation was due to ERPPD under § 70-1010(2)(b) for remaining reintegration costs in the south annexation area.

The substation in question is substation 71-18, located outside the south annexation area but near the southeast edge of the annexed territory. The substation was built in or around 1998. The record establishes that at the time of its construction, the substation was not built at the center point of its load. Such substations usually have a life cycle of about 50 years. The

substation serves approximately 4 megawatts of load over three circuits. One of these three circuits is used primarily to serve the load in the south annexation area. Overall, the substation will lose approximately 26 percent of its current load following the annexation.

Given this loss, ERPPD investigated options for the substation following the annexation. The option ERPPD felt was most cost efficient and feasible was to move the substation 2½ miles to the northeast. Such a move would allow ERPPD to best serve its remaining load following the annexation, but also had the potential to increase the capacity of the substation. ERPPD calculated that the total cost of moving the substation would be approximately $935,000 and that $337,567 was solely attributable to the Neligh annexation.

The Board found in Neligh's favor, concluding that ERPPD had not built the substation in the center of its load and that to require a move partially paid for by Neligh would be a betterment to which ERPPD was not entitled. The Board denied ERPPD's motion for reconsideration. ERPPD appeals.

## ASSIGNMENTS OF ERROR

ERRPD assigns three assignments of error that can be restated as one: The Board erred in failing to award compensation for reintegration costs under § 70-1010(2)(b) to ERPPD for the lost substation circuit.

## STANDARD OF REVIEW

[1,2] A decision of the Board will be affirmed if it is supported by the evidence and is not arbitrary, capricious, unreasonable, or otherwise illegal.[1] The meaning of a statute is a question of law, and a reviewing court is obligated to reach conclusions independent of the determination made below.[2]

---

[1] *In re Application of City of North Platte*, 257 Neb. 551, 599 N.W.2d 218 (1999).

[2] *Id.*

## ANALYSIS

This appeal presents the question of what compensation is owed to ERPPD for reintegration costs under § 70-1010(2)(b).

On appeal, ERPPD observes it is largely undisputed that one of the three circuits of the substation at issue carries no load as a result of the annexation and that the substation has lost 26 percent of its total load due to the nonuse of this circuit. As such, ERPPD contends that moving the substation nearer to the center of its load is the most efficient solution to the loss of capacity and is a direct result of the annexation. ERPPD seeks reimbursement for a portion of this cost as reintegration costs under § 70-1010(2)(b).

Neligh, however, argues that this loss of load was already accounted for via the payment Neligh stipulated to under § 70-1010(2)(c). Neligh also notes that prior to the annexation, the substation was not at the load center. Because the substation was not at the load center and would allow ERPPD to more efficiently serve its existing customers as well as offer the potential for new customers, Neligh contends that such a move is a betterment not permitted under § 70-1010(2)(b). The Board concurred with Neligh.

Under § 70-1010(2), Neligh, as the "supplier acquiring the certified service area, distribution facilities, and customers," is statutorily required to "purchase the electric distribution facilities of the supplier located within the affected area, together with the supplier's rights to serve within such area." This payment should include

(a) the current reproduction cost if the facilities being acquired were new, less depreciation computed on a straight-line basis at three percent per year not to exceed seventy percent, plus (b) an amount equal to the nonbetterment cost of constructing any facilities necessary to reintegrate the system of the supplier outside the area being transferred after detaching the portion to be sold, plus (c) an amount equal to two and one-half times the annual revenue received from power sales to existing

customers of electric power within the area being trans-
ferred . . . .[3]

The parties agree as to the consideration due for
§ 70-1010(2)(a) and (c). At issue are certain "reintegrat[ion]"
costs under § 70-1010(2)(b).

"Reintegration" is not explicitly defined in statute or by
Nebraska case law. As such, we turn to other jurisdictions for
guidance. In *City of Cookeville v. Upper Cumberland Elec.*,[4]
the Sixth Circuit, applying Tennessee statutes nearly identical
to Nebraska's statutes, noted that the dictionary definition of
"'reintegrate'" was "'to restore to unity after disintegration.'"
The court observed:

> The structure of [subsection (a)(2) of the relevant statute]
> suggests that the reintegration costs are those necessary
> to place the system in the same state of integration that
> it was in prior to the condemnation. [Subsection (a)(2)
> (A) of the statute] provides for replacement costs for any
> facilities acquired by the municipality whereas [subsec-
> tion (a)(2)(B)] then provides for the cost of construct-
> ing "necessary facilities to reintegrate the system of the
> cooperative." This scheme suggests that the reintegration
> costs are those necessary to reconnect the replaced facili-
> ties into the cooperative's existing electrical system. To
> bring the system back to "unity" would involve placing
> the system in as integrated a condition as existed prior to
> the annexation.[5]

ERPPD presented the Board with multiple options for
allowing it to restore unity to its system following the south
annexation: (1) upgrading the line to extend the reach of the
substation to new customers, (2) moving the substation to the
exact load center, or (3) moving the substation 2½ miles closer
to the load center. In addition, the Board heard testimony on

---

[3] § 70-1010(2).

[4] *City of Cookeville v. Upper Cumberland Elec.*, 484 F.3d 380, 392 (6th Cir. 2007).

[5] *Id.*

a fourth option: reducing the capacity of the substation by replacing its existing transformers with smaller ones. ERPPD's expert testified that ERPPD's preferred method was to move the substation 2½ miles closer to the load center. ERPPD sought a portion of the costs of this move as reintegration costs under § 70-1010(2)(b).

The Board rejected ERPPD's proposed substation move, instead agreed with Neligh that "any effect on the total economic impact [on ERPPD was] captured by the compensation [Neligh] will pay to [ERPPD] for the loss of the customers and facilities located inside the south annexation" area, and accordingly rejected ERPPD's claim for reintegration costs under § 70-1010(2)(b). The Board noted that the relocation of the substation would be a betterment to ERPPD.

This court will affirm decisions of the Board unless they are unsupported by the evidence or are arbitrary, capricious, unreasonable, or otherwise illegal. We conclude that in this case, the Board's actions were arbitrary, capricious, and unreasonable.

It is undisputed that ERPPD's loss of load came from customers in the south annexed area. Indeed, the parties have stipulated to the compensation due for lost revenue. But reintegration costs are based on the amount needed to compensate ERPPD for the impact to its physical asset—the substation—and are not related to the loss of revenue or loss of facilities, which are provided for separately under § 70-1010(2).

We held as much in *In re Application of City of Lexington*.[6] In that case, we affirmed the Board's decision, made on similar facts, that compensation was owed for surplus property—a transmission line substation and feeder circuits—lying outside of an annexed area. We agreed with the Board's conclusion that this cost was not subsumed in the compensation provided for under § 70-1010(2)(c) and was instead distinct from that loss of revenue.

---

[6] *In re Application of City of Lexington*, 244 Neb. 62, 504 N.W.2d 532 (1993).

Section 70-1010(2) clearly contemplates compensation for loss of revenue, facilities, and impact to physical assets. ERPPD was entitled to have its system "'restore[d] to unity'" following the south annexation.[7] By conflating the revenue due for the load under § 70-1010(2)(c) with the reintegration costs ERPPD was entitled to under § 70-1010(2)(b), and despite our prior holding in *In re Application of City of Lexington* suggesting that the two types of compensation are distinct, the Board failed to provide compensation for ERPPD's reintegration costs and acted in an arbitrary, capricious, and unreasonable manner.

Moreover, the Board also acted in an arbitrary, capricious, and unreasonable manner when it focused its analysis solely on the preferred route of moving the substation 2½ miles to the northeast without also considering the alternative proposals presented or otherwise determining Neligh's liability for the undisputed injury caused to ERPPD's system by the south annexation. The Board abdicated in part its statutory duty under § 70-1010(2) to "determine the total economic impact on the selling supplier and establish the price accordingly based on, but not limited to, the . . . guidelines" set forth in § 70-1010(2)(a), (b), and (c).

There is merit to ERPPD's argument on appeal. We reverse the decision of the Board and remand the cause for further proceedings.

## CONCLUSION

The decision of the Board is reversed, and the cause is remanded for further proceedings.

Reversed and remanded for
further proceedings.

Wright, Miller-Lerman, and Kelch, JJ., not participating.

---

[7] See *City of Cookeville v. Upper Cumberland Elec., supra* note 4, 484 F.3d at 392.